**Rafael Rivera FERNANDEZ, et al., Plaintiffs-Appellants,**

v.

**Carlos CHARDON, Etc., et al., Defendants-Appellees.**

**Juan Fumero SOTO, et al., Plaintiffs-Appellees-Cross-Appellants,**

v.

**Carlos CHARDON, Etc., et al., Defendants-Appellants-Cross-Appellees.**

**Nos. 80–1237 et al., 81–1567 and 81–1607.**

United States Court of Appeals, First Circuit.

Argued Feb. 5, 1982.

Submitted March 17, 1982.

Decided June 8, 1982.

As Modified on Denial of Rehearing July 6, 1982.

Sheldon H. Nahmod, Chicago, Ill., Hiram R. Cancio, Harry R. Nadal-Arcelay, Jaime R. Nadal-Arcelay, Jesus R. Rabell-Mendez, and Cancio, Nadal & Rivera, San Juan, P. R., on brief for appellants.

K. Martin Worthy, John G. DeGooyer, Stephen L. Humphrey, Hamel, Park, McCabe & Saunders, Washington, D. C., Hector Reichard De Cardona, Secretary of Justice, and Ines Eguia De Casanova, Atty., Dept. of Justice of Puerto Rico, San Juan, P. R., on brief for appellees.

Before CAMPBELL, BOWNES, and BREYER, Circuit Judges.

Before COFFIN, Chief Judge, GIBSON,[*] Senior Circuit Judge, and BOWNES, Circuit Judge.

BOWNES, Circuit Judge.

Before us in the instant action are two groups of consolidated cases that represent fifty-five and thirty-six cases, respectively. All ninety-one cases are actions based on 42 U.S.C. § 1983 charging illegal acts of political discrimination. The first group of consolidated cases, *Fumero Soto v. Chardon,* is an appeal from a jury verdict that defendants are liable to plaintiffs in the fifty-five cases and from the relief ordered by the court in its equitable power. The second group of consolidated cases, *Rivera Fernandez v. Chardon,* is on remand from the Supreme Court, which, in *Chardon v. Rivera Fernandez,* 454 U.S. 6, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981), reversed our decision on the statute of limitations issue in these cases, *Rivera Fernandez v. Chardon,* 648 F.2d 765 (1st Cir. 1981).[1] The *Rivera Fer-*

---

[*] Of the Eighth Circuit, sitting by designation.

1. Our decision in *Rivera Fernandez* dealt with only twenty-three of the cases; we disposed of the other thirteen cases with separate but identical judgments. *Chardon v. Rivera Fernandez,* 454 U.S. 6, —— n.1, 102 S.Ct. 28, 28 n.1, 70 L.Ed.2d 6 (1981).

*nandez* cases had been dismissed by the district court and were not tried on the merits. We deal with these two sets of cases together because they both present questions concerning the tolling of the statute of limitations that are not foreclosed by the prior decisions in *Rivera Fernandez.* In addition, the defendants in *Fumero Soto* argue that the jury verdict was not supported by the evidence and that the damages award against the Puerto Rico Department of Education violated the eleventh amendment; plaintiffs in *Fumero Soto* contend that the individual defendants enjoy no immunity.

*The Facts and Case Histories*

All the *Fumero Soto* and *Rivera Fernandez* cases arose out of essentially the same facts. The plaintiffs in all cases held nontenured administrative positions in the Commonwealth of Puerto Rico Department of Education during the school year 1976–77. The defendants are Carlos Chardon, then Secretary of Education for the Commonwealth, Oscar Ramos, then and now Assistant Secretary for Personnel in the same department, and Maria Socorro Lacot, now the Secretary of Education, who was substituted for Chardon in his official capacity. Chardon and Ramos were originally sued in both their official and individual capacities. The events leading up to the instant actions began in January, 1977, when Carlos Romero Barcelo of the New Progressive Party (NPP) replaced Rafael Hernandez Colon of the Popular Democratic Party (PDP) as governor. Chardon and Ramos, members of the NPP, soon assumed positions in the Department of Education under the new regime. Chardon and Ramos, according to plaintiffs' complaints, then determined to remove nonpermanent administrative personnel who were active in the PDP or parties other than the NPP.

All the plaintiffs received letters—most of them in May and June 1977—from Julio Cintron Lopez, Director of the Teaching Personnel Division, informing them that they would not be reappointed to the administrative positions they currently held for the school year 1977–78 and that they would instead be required to return to the lower-paying, tenured teaching positions that they had held before. Three of the *Rivera Fernandez* plaintiffs had not previously held tenured teaching posts, so they were discharged. Most, if not all, of the plaintiffs sent letters of protest to Chardon, objecting to their demotion or termination and informing him that they were referring the matter to the Teachers Association of Puerto Rico for appropriate legal action.[2]

On June 19, 1978, one demoted employee, Jose Ortiz Rivera, filed a class action against Chardon and Ramos in their individual and official capacities on behalf of all persons discharged or demoted by Chardon and Ramos for political reasons, claiming a violation of first and fourteenth amendment rights protected by 42 U.S.C. § 1983[3] and P.R. Laws Ann. tit. 18, §§ 214, 249a, 249e.[4] Class certification was denied

2. The letters were all virtually identical, the texts of which read in substance as follows:

Dear Mr. Secretary:

I have received a letter from the Department you direct dated [date], signed by Mr. Julio Cintron Lopez, Director of the Teaching Personnel Division. I am not in agreement with your decision.

To that effect, I have sent a copy of the letter to the Teachers Association of Puerto Rico, so that said organization would instruct its Legal Division to take the corresponding action.

In the meanwhile, I will obey the order issued by you.

Sincerely,

3. 42 U.S.C. § 1983 provides in relevant part as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

4. P.R.Laws Ann. tit. 18, § 214 provides as follows:

Every public-school teacher in active service through an appointment made in accordance with the school law, the regulations of the Department of Education, and the regulations of the Commonwealth Board for Voca-

on August 21, 1978, because the class was not so numerous that joinder was impracticable. Fed.R.Civ.P. 23(a)(1). Plaintiffs then filed complaints individually in January, 1979, the earliest filings occurring on January 10. The individual complaints repeated the claims of Ortiz Rivera's class suit.

The history of the *Rivera Fernandez* cases is as follows. The district court dismissed the cases on the ground that they were barred by Puerto Rico's one-year statute of limitations. *E.g., Aviles Navarro v. Chardon,* 506 F.Supp. 229 (D.P.R.1980). We reversed, holding that the letter notifications did not trigger the statute, but that the actual demotions and discharges did and that suit was filed within one year of these events. *Rivera Fernandez v. Chardon,* 648 F.2d 765 (1st Cir. 1981). The Supreme Court reversed, finding that *Delaware State College v. Ricks,* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), controlled and that the letter notifications started the

statute running. *Chardon v. Rivera Fernandez,* 454 U.S. 6, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981).

Meanwhile, decision was reserved on the statute of limitations question in the remaining fifty-five cases (*Fumero Soto*). These cases were consolidated for trial, and the trial was bifurcated into liability and damages phases. After a five-day trial of the liability issues, a six-person jury returned unanimous verdicts in favor of the plaintiffs. The jury was also asked to answer special interrogatories, whether Chardon or Ramos acted with malicious intent to deprive plaintiffs of their constitutional or other rights. The jury answered these questions in the negative. The district court, 514 F.Supp. 339, then asserted its equitable power to declare a remedy and ordered the Department of Education to reinstate those plaintiffs still in its employ to the positions they had held before their demotions and to give them back pay reflecting the difference in salary between

tional and Technical Education, who shall have practiced as such in a school of any category during the probation period hereinafter specified, shall be entitled to be contracted as a permanent teacher in the category in which he may be practicing his profession at the expiration of the said probation period, without any further proof of classification or professional ability than the holding of a regular license of the same category of the position held by the teacher and to have, in the opinion of the Department, performed satisfactory work. For the purposes of sections 214–218 of this title, no consideration shall be given to the time such teachers may have been practicing as temporary teachers. Such teachers shall be entitled to be contracted as permanent teachers in the municipality where they may be teaching at the expiration of the probation period. The time worked by teachers with regular certificates as substitutes and who have performed satisfactory work in positions of the same category shall be confirmed as probationary period. The equivalence of the two (2) years of probationary period shall comprise the work performed with a substitute or probationary contract during two (2) consecutive years. Such teachers shall be entitled to be contracted as probationary or permanent teachers in the municipality where they may be teaching when entitled to a regular position. P.R.Laws Ann. tit. 18, § 249a provides as follows:

For the purposes of sections 249a–249e of this title, all public-school teachers of Puerto Rico shall be considered as officers or employees of the Commonwealth Government while they are in active service, irrespective of the form and manner in which they may render their services to the people of Puerto Rico. By public-school teachers shall be understood, for the purposes of sections 249a–249e of this title, all teaching personnel, which includes both the teachers in charge of the teaching and special services directly connected with the teaching work, and the officers or employees in technical tasks or in school supervision and administration; all the teaching personnel contracted by the Vocational Education Board of Puerto Rico and those teachers contracted as such by other departments or agencies of the Commonwealth of Puerto Rico.

P.R.Laws Ann. tit. 18, § 249e provides as follows:

The school authorities and all other authorities are hereby enjoined from all discrimination or reprisal against a teacher by reason of his affiliation, creed and political actions; and it is further forbidden that the circumstances mentioned above be taken into consideration in deciding questions such as transfers, work assignment, salary raises, promotions, scholarships, leaves of absence, and any other matters relative to the teacher's professional work or status.

their former positions and the positions to which they were demoted. Plaintiffs who had left the Department were held not entitled to reinstatement and were to receive back pay only for the period from the time of demotion to the time they left. On the basis of the jury's findings of no malicious intent, the court refused to award damages against Chardon and Ramos in their individual capacities or to award punitive damages. Defendants appealed; on August 14, 1981, we stayed that portion of the order requiring back pay because of "significant questions" as to its validity.

*The Issues*

 The general issue is whether claims by any or all of the *Rivera Fernandez* and *Fumero Soto* plaintiffs were barred by the statute of limitations.[5] Before discussing the separate arguments raised, it is useful to mark a few recognized principles. In the absence of a federal statute of limitations, the analogous state statute is applied to the federal cause of action. *E.g., Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 462, 95 S.Ct. 1716, 1721, 44 L.Ed.2d 295 (1975); *O'Sullivan v. Felix,* 233 U.S. 318, 322, 34 S.Ct. 596, 597, 58 L.Ed. 980 (1914). In Puerto Rico, the limitations period applicable to a § 1983 claim alleging violation of first amendment rights is one year. P.R. Laws Ann. tit. 31, § 5298(2); *Graffals Gonzalez v. Garcia Santiago,* 550 F.2d 687, 688 (1st Cir. 1977) (per curiam). At least as a matter of *federal* law, the filing of a class action will toll the statute of limitations for named and unnamed members of the class, and the statute will resume running when class certification is denied. *American Pipe & Constr. Co. v. Utah,* 414 U.S. 538, 561, 94 S.Ct. 756, 770, 38 L.Ed.2d 713 (1974).

Under *American Pipe*, the one-year statute of limitations would have been tolled on June 19, 1978, when Ortiz Rivera filed his class action. The tolling would have ended, and the remaining portion of the limitations period would have recommenced running on August 21, 1978, when the district court declined to certify the class. Over half of the plaintiffs in both sets of cases had received notice of demotion more than one year before Ortiz Rivera filed suit, so their claims would already have been time-barred. The remaining plaintiffs would have had from one to one hundred and thirty-eight days to file individual complaints after August 21, 1978. The earliest individual complaints were not filed, however, until January 10, 1979, after expiration of the remaining one hundred and thirty-eight day period.

Plaintiffs mount three attacks on the statute of limitations: that *Ricks* should not be applied retroactively; that the letters of protest tolled the statute of limitations;[6] and that the denial of class action certification in Ortiz Rivera's suit did not merely reactivate the statute of limitations, the *American Pipe* rule, but instead caused it to run anew. It is important to determine at the outset the relationships between these three contentions. The critical dates must be kept in mind: May-June 1977, notification by letters; August 31, 1977, plaintiffs vacate their positions; June 19, 1978, class action filed; August 21, 1978, class action dismissed; and January 10, 1979, first individual complaint filed.

The first claim, nonretroactivity, is insufficient alone to save all but a few of the suits because it would merely move the accrual date from the dates demotion letters were received to the date plaintiffs had to leave their positions, August 31, 1977. The class suit was filed nine months, nineteen days after that, so that, under the *American Pipe* rule, when class certification was denied on August 21, 1978, only two months, eleven days would have remained for all plaintiffs to file complaints. The

---

5. We take it that statute of limitations defenses were preserved in all cases. Defendants state that they raised the affirmative defense in timely fashion, and there is no contrary evidence. Nor do we believe that the defense was subsequently waived in any case, although the record on which plaintiffs rely for this argument is lamentably unclear.

6. Plaintiffs also argue in the alternative that this issue should be certified to the Supreme Court of Puerto Rico.

period thus would have expired on November 1, 1978, before which time no individual complaints had been filed.

The second position, that the letters of protest sent by plaintiffs were sufficient under Puerto Rican law to toll the statute of limitations so that it commenced running anew, is also inadequate alone in all but a few cases. This would save the otherwise time-barred claims of those who received notice of demotion prior to June 19, 1977, but who did not write a protest letter until after that date. The filing of the class action would then have been timely as to them. After certification was denied on August 21, 1978, they would have had whatever time had not expired from the one-year period in which to sue individually. The unexpired time would be insufficient in most cases, however, to carry over into January.

The third contention, that denial of class certification on August 21, 1978, starts the one-year statute running from scratch, by itself would save claims that were based on notices of termination received within a year prior to filing of the class action, June 19, 1978. This rule alone would not help any of the *Rivera Fernandez* plaintiffs, all of whom received discharge notifications before June 19, 1977. In combination with the nonretroactivity contention, this would save all *Rivera Fernandez* and *Fumero Soto* claims because they would not accrue until August 31, 1977. In combination with the letter tolling contention, the third argument would save those additional claims in which notice was received before June 19, 1977, but a letter of protest was sent after that date.

*The Tolling Effect of the Class Action*

■ The linchpin of plaintiffs' contentions, therefore, is that, under Puerto Rican law, a class action will cause the statute of limitations to begin running anew. Puerto Rican tolling rules, rather than the federal rule of *American Pipe* in which the running of the limitations period is merely suspended, apply, unless they are inconsistent with federal law. *Board of Regents v. Tomanio*, 446 U.S. 478, 483–86, 100 S.Ct. 1790, 1794,

1796, 64 L.Ed.2d 440 (1980). Under P.R. Laws Ann. tit. 31, § 5303, the limitations period against an action ceases to run when the action is instituted in court; if the action is discontinued, the case law has held that the limitations period begins to run anew from that time. *E.g., Feliciano v. Puerto Rico Aqueduct & Sewer Auth.*, 93 P.R.R. 638, 644 (1966); *Heirs of Gorbea v. Portilla*, 46 P.R.R. 279 (1934); *De Jesus v. De Jesus*, 37 P.R.R. 143 (1927). *See also Hernandez Del Valle v. Santa Aponte*, 440 F.Supp. 254 (D.P.R.1977), *rev'd on other grounds*, 575 F.2d 321 (1st Cir. 1978); *Bedard v. Consolidated Mutual Insurance Co.*, 313 F.Supp. 1021, 1021–22 (D.P.R.1970). This tolling is effective only with regard to identical causes of action; the filing of one action does not toll the statute of limitations for all claims arising out of the same facts. *Ramirez de Arellano v. Alvarez de Choudens*, 575 F.2d 315, 319–20 (1st Cir. 1978). The substantive claims asserted in Ortiz Rivera's class action complaint were identical to those alleged in the subsequent individual complaints. The question here is whether a class action is different from an individual complaint—at least as to unnamed plaintiffs in the class action—for purposes of the identical claim rule. The Puerto Rico Supreme Court has not ruled on this question. The obvious analogy is to the federal rule of *American Pipe*, wherein the running of the statute of limitations was suspended as to both named and unnamed class members. Defendants argue, however, that *American Pipe* cannot be used here because plaintiffs have resisted that part of the *American Pipe* rule that provides for suspension and have instead insisted that the statute of limitations run anew.

■ To the extent that defendants make an estoppel argument, we reject it, but the substance of their argument bears further consideration. Application of state tolling rules to § 1983 claims is required by 42 U.S.C. § 1988, *Board of Regents v. Tomanio*, 446 U.S. at 484–85, 100 S.Ct. at 1795; *Robertson v. Wegmann*, 436 U.S. 584, 588, 98 S.Ct. 1991, 1994, 56 L.Ed.2d 554 (1978),

unless the state rules are inconsistent with the federal policy underlying § 1983, *Board of Regents v. Tomanio*, 446 U.S. at 485–86, 100 S.Ct. at 1795, 1796; *see Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 465, 95 S.Ct. 1716, 1722, 44 L.Ed.2d 295 (1975) (same as to § 1981 claims). Thus in a § 1983 case, the federal rule and underlying reasoning of *American Pipe* are not generally applicable. *Johnson v. Railway Express Agency, Inc.*, 421 U.S. at 466–67, 95 S.Ct. at 1723. *But see Morton v. Charles County Bd. of Educ.*, 373 F.Supp. 394, 396 (D.Md.1974), *aff'd on other grounds*, 520 F.2d 871 (4th Cir.), *cert. denied*, 423 U.S. 1034, 96 S.Ct. 566, 46 L.Ed.2d 408 (1975) (under *American Pipe*, § 1983 class action tolled limitations period for all class members). In the instant case, though, there is no discernible state rule. Moreover, Puerto Rico has modeled its class action procedure, P.R. Laws Ann. tit. 32, App. II, R. 20.1, on the federal class action procedure. *Caguas Lumber Yard, Inc. v. Superior Court*, 96 P.R.R. 826, 830 (1969). Because the decision in *American Pipe* that unnamed class members could take advantage of the tolling effect of a pending class action was based on an interpretation of the federal class action rule, Fed.R.Civ.P. 23(a), *American Pipe & Constr. Co. v. Utah*, 414 U.S. at 550–52, 94 S.Ct. at 764–65, we believe that this reasoning would also be applied in determining the relationship between class actions and tolling rules in Puerto Rico. We conclude that named and unnamed plaintiffs may benefit from the tolling effect of a class action, if class certification is later denied on grounds of lack of numerosity. *Cf. id.* at 552–53, 94 S.Ct. at 765–66.

This conclusion answers only half of the question. The issue remains whether *American Pipe* or other reasons require that unnamed class members gain the benefit only of suspension of the running of the limitations period, notwithstanding the Puerto Rican rule that the statute starts to run anew under similar circumstances. In *American Pipe*, the pendency of the class action suspended the running of the limitations period because the statute providing the underlying cause of action, section 5(b) of the Clayton Act, provided for suspension where the government filed suit under the statute. *American Pipe & Constr. Co. v. Utah*, 414 U.S. at 560–61, 94 S.Ct. at 769–70. In this case, neither § 1983 nor any of the related Civil Rights Acts provisions suggest the precise effect that commencement of a class action or any other action should have. It is true that "in the American common law generally, prior judicial actions do not toll the statute of limitations, no matter how close their relationship to the one at bar." *Ramirez de Arellano v. Alvarez de Choudens*, 575 F.2d at 319 (citations omitted). Puerto Rico has not adopted the American common law, however, and we see no reason not to apply its running-anew rule to unnamed plaintiffs. None of the parties has pressed on us an argument that the federal policies underlying § 1983 require a particular result here, *see Board of Regents v. Tomanio*, 446 U.S. at 485–86, 100 S.Ct. at 1795–96, and we can discern no particularly strong policies implicated. Two policies often associated with § 1983 and tolling rules are those of repose and federalism. *See Williams v. Walsh*, 558 F.2d 667, 674–75 (2d Cir. 1977). In this case, the class action—assuming that it itself was timely filed, a matter we discuss below—did not disturb any protected repose defendants enjoyed with respect to § 1983 claims, and commencement of a new limitations period after the pendency of the class action would not interrupt any further repose. In addition, defendants are Puerto Rican, and there is no unfair surprise in following Puerto Rican law. The policy of federalism also appears to be well served: Puerto Rican law is permitted its fullest effect without any visibly adverse impact on federal rights. We hold, therefore, that a class action asserting a § 1983 claim tolls the Puerto Rican statute of limitations during the pendency of the class action for all purported class members and that when class certification is denied for lack of numerosity, the limitations period begins to run anew.

*The Retroactivity of* Delaware State College *v.* Ricks

We now turn to the two remaining arguments on tolling, keeping in mind that the

one-year statute of limitations was tolled by the filing of the class action on June 19, 1978, and started running anew when the class certification was denied on August 21, 1978. Success on the contention that the Supreme Court's decision in *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431, should not be applied retroactively would save all suits, so we now examine that. Defendants in *Fumero Soto* argue that the decision in *Chardon v. Rivera Fernandez*, 454 U.S. 6, 102 S.Ct. 28, 70 L.Ed.2d 6, controls this issue and requires retroactivity because the facts in that group of cases involved the same alleged incidents of political discrimination as the *Fumero Soto* cases do. Nothing is said in the *Rivera Fernandez* opinion regarding retroactivity.[7] We do not think that the retroactivity question is therefore foreclosed.

▇ The application of nonretroactivity depends on an evaluation of

three separate factors. First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, see, *e.g.*, *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, [392 U.S. 481], 496, [88 S.Ct. 2224, 2233, 20 L.Ed.2d 1231], or by deciding an issue of first impression whose resolution was not clearly foreshadowed, see, *e.g.*, *Allen v. State Board of Elections*, [393 U.S. 544,] 572 [89 S.Ct. 817, 835, 22 L.Ed.2d 1]. Second, it has been stressed that "we must ... weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." *Linkletter v. Walker*, [381 U.S. 618,] 629, [85 S.Ct. 1731, 1737, 14 L.Ed.2d 601]. Finally, we have weighed the inequity imposed by retroactive appli-

cation, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity." *Cipriano v. City of Houma*, [395 U.S. 701,] 706 [89 S.Ct. 1897, 1900, 23 L.Ed.2d 647].

*Chevron Oil Co. v. Huson*, 404 U.S. 97, 106–07, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971). *See Aufiero v. Clarke*, 639 F.2d 49, 51 (1st Cir.), *cert. denied*, 452 U.S. 917, 101 S.Ct. 3052, 69 L.Ed.2d 421 (1981). In analyzing *Chevron Oil's* first factor, plaintiffs direct us to several cases purportedly standing for the proposition that a § 1983 cause of action accrues when plaintiff is actually demoted or terminated. The weight of authority is far less than plaintiffs suggest. One of the cases cited stands essentially for the *Ricks* rule of accrual rather than for plaintiffs' asserted rule, *NLRB v. California School of Professional Psychology*, 583 F.2d 1099, 1101–02 (9th Cir. 1978) (applying § 10(b) of National Labor Relations Act); *accord, Nazareth Regional High School v. NLRB*, 549 F.2d 873, 882 (2d Cir. 1977), three cited cases stand equally well for the *Ricks* rule as for plaintiffs' rule, *Morelock v. NCR Corp.*, 586 F.2d 1096, 1103 (6th Cir. 1978), *cert. denied*, 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979) (Age Discrimination in Employment Act); *Payne v. Crane Co.*, 560 F.2d 198, 199 (5th Cir. 1977) (per curiam) (same Act); *Fitzgerald v. Seamans*, 553 F.2d 220, 226–31 (D.C.Cir.1977) (42 U.S.C. § 1985(3)), two are at best suggestive of plaintiffs' proposition, as we observed in *Rivera Fernandez v. Chardon*, 648 F.2d at 768, *Bonham v. Dresser Industries, Inc.*, 569 F.2d 187, 192 (3d Cir. 1977), *cert. denied*, 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978) (Age Discrimination in Employment Act); *Moses v. Falstaff Brewing Corp.*, 525 F.2d 92, 95 (8th Cir. 1975) (same

---

**7.** In further asserting the conclusive effect of *Rivera Fernandez*, defendants argue that the Supreme Court denied the *Rivera Fernandez* plaintiffs' petition for rehearing, which raised the nonretroactivity issue. Defendants' argument is utterly without merit because surely the denial of a petition for rehearing can have

no greater precedential effect than the denial of a petition for certiorari, which is to say none. *See Maryland v. Baltimore Radio Show, Inc.*, 338 U.S. 912, 919, 70 S.Ct. 252, 255, 94 L.Ed. 562 (1950) (opinion of Frankfurter, J., respecting denial of petition for writ of certiorari).

Act), and only one offers square support for plaintiffs' rule, *Egelston v. State Univ. College at Geneseo*, 535 F.2d 752, 755 (2d Cir. 1976) (Title VII). Moreover, despite the Second Circuit's decision in *Egelston*, the Fourth Circuit reached a contrary conclusion in December, 1977, *Bireline v. Seagondollar*, 567 F.2d 260, 263 (4th Cir. 1977), *cert. denied*, 444 U.S. 842, 100 S.Ct. 83, 62 L.Ed.2d 54 (1979). It is true that, as of the summer of 1977, little law existed regarding the accrual date of a § 1983 cause of action, but the one established principle was that a civil rights cause of action accrued when plaintiff knew or had reason to know of his or her injury, *see, e.g., Cox v. Stanton*, 529 F.2d 47, 50 (4th Cir. 1975); 1 C. Antieau, Federal Civil Rights Acts § 241, at 412 (2d ed. 1980), which could support either the *Ricks* rule or plaintiffs' rule.** We cannot say that *Ricks* established a new principle of law, either by overruling clear past precedent or by deciding an issue of first impression. *Chevron Oil Co. v. Huson*, 404 U.S. at 106, 92 S.Ct. at 355.

■ The second factor bearing on nonretroactivity involves examining " 'the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation.' " *Chevron Oil Co. v. Huson*, 404 U.S. at 107, 92 S.Ct. at 355, quoting *Linkletter v. Walker*, 381 U.S. 618, 629, 85 S.Ct. 1731, 1737, 14 L.Ed.2d 601 (1965). *Linkletter* restated the inquiry as one into the purpose of the new rule, reliance placed on the old rule, and the effect of retroactivity on the administration of justice, *Linkletter v. Walker*, 381 U.S. at 636, 85 S.Ct. at 1741. The inquiry has also been construed more simply as the last clause of the *Chevron Oil* factor: whether retroactive application will further or retard operation of the rule, *Wiltshire v. Standard Oil Co.*, 652 F.2d 837, 841 (9th Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 1737, 72 L.Ed.2d 153 (1982). However stat-

ed, this test for the retroactivity of a rule of law requires an explanation of the purposes of the new rule and consideration of its impact on the prior law, which thereby make this test dependent on the first factor: the less (or the less clear) prior law, the less adverse impact there would be, and this would militate against retroactivity. The accrual rule of *Ricks* seems to promote more strongly the policy of repose that underlies the applicable state statute of limitations. The policy of repose is that a defendant can be expected to defend a suit only for a certain period after the act complained of. The period of susceptibility to suit should begin when the defendant is first aware (or should be aware) of facts that give rise to the concrete possibility of suit. A competing policy is that a limitations period should not begin to run against a plaintiff until he is or should be aware of the actionable conduct. Under *Ricks* these policies are reconciled as follows: the crux of a § 1983 action is a discriminatory act, and in an employment case, this act occurs—and the limitations period begins to run—when notice of termination or demotion is given, not when the firing or demotion actually takes effect. Retroactive application of *Ricks* would give greater protection to defendants' repose without unduly limiting plaintiffs' ability to sue. Moreover, given the at best unsettled state of the law on accrual before *Ricks*, retroactive application would not disrupt expectations of either party. There would also seem to be little impact on the administration of justice whether or not *Ricks* is applied retroactively. The second test of *Chevron Oil* thus does not require nonretroactivity.

We might still find retroactivity barred if it would produce substantially inequitable results, the third *Chevron Oil* factor. This factor reflects concern that a plaintiff not

** This observation relates to the question whether in a retroactivity analysis, we should focus on the state of the law at the time the claim arose, *Wachovia Bank & Trust Co. v. National Student Marketing Corp.*, 650 F.2d 342, 347 (D.C.Cir.1980), *cert. denied*, 452 U.S. 954, 101 S.Ct. 3098, 69 L.Ed.2d 965 (1981), or on the state of the law when the new decision comes out. We intimate no views on whether we agree with *Wachovia Bank*. That opinion would provide a stricter test for retroactivity here; we think that under *Wachovia* the "new" law was clear at the time plaintiffs' claims arose.

be accused of "sleeping on his rights" when he could not have known of restrictions on his rights, *Chevron Oil Co. v. Huson*, 404 U.S. at 108, 92 S.Ct. at 356, and that injustice or hardship not be caused, *Cipriano v. City of Houma*, 395 U.S. 701, 706, 89 S.Ct. 1897, 1900, 23 L.Ed.2d 647 (1969) (per curiam). The equities that the *Fumero Soto* plaintiffs rely on are their day in court to vindicate their right to freedom from political discrimination, the existing jury finding of liability on the part of the defendants, and the expenses already incurred at trial. Neither group of plaintiffs advance any reason, however, as to why they waited so long before filing suit, thereby risking a time bar if the date of notice of demotion were to become the accrual date. The then-existing law was not at all clear on this point. The right plaintiffs seek to enforce is not so important that limitations periods should be disregarded. The expenditure of time and energy in the *Fumero Soto* case is regrettable, but the limitations problem had been recognized before the case was tried on its merits. We are unpersuaded that equity requires *Ricks* to be applied prospectively only, and we hold that *Ricks* applies retroactively.

*The Tolling Effect of the Letters of Protest*

■ We now turn to the argument that letters sent by the plaintiffs in both cases to Chardon and the Department of Education protesting their demotions constituted "extrajudicial claim[s] of the creditor[s]" within the meaning of P.R. Laws Ann. tit. 31, § 5303, which thereby tolled the limitations period and caused it to run anew. We have held that such extrajudicial claims must be "precise and specific" in order to have this desired tolling effect. *Gual Morales v. Hernandez Vega*, 604 F.2d 730, 733 (1st Cir. 1979), citing *Jimenez v. District Court*, 65 P.R.R. 35, 42 (1945). A proper extrajudicial claim must seek the same relief ultimately sought in the subsequent lawsuit. *Hernandez Del Valle v. Santa Aponte*, 575 F.2d

321, 323–24 (1st Cir. 1978). Plaintiffs believe that their protest letters satisfied these conditions. If they do not, however, they urge us to reconsider *Gual Morales* and *Hernandez Del Valle* for the following three reasons: the Supreme Court's recent decision in *Board of Regents v. Tomanio*, 446 U.S. 478, 100 S.Ct. 1790, requires modification of our decisions; Puerto Rican law treats "extrajudicial claim" more liberally than do our decisions; and *Hernandez Del Valle* erroneously used federal law in construing "extrajudicial claim" restrictively. Alternatively, they request that we certify to the Puerto Rico Supreme Court the question of the tolling effect of the protest letters.

■ The *Rivera Fernandez* and *Fumero Soto* plaintiffs sent virtually identical letters of protest to Chardon in which each plaintiff acknowledged receipt of his demotion letter, stated his disagreement with the decision, informed Chardon that he had sent a copy of the demotion letter to the Puerto Rico Teachers Association to take appropriate action, and said he would obey the order.[8] These letters did not make a "precise and specific" claim for the relief ultimately sought. The plaintiffs later sought reinstatement, back pay, actual and punitive damages, costs and attorney's fees, and a permanent injunction against defendants from any further acts of political discrimination. None of these claims were asserted in the letters; the letters allude only to necessary legal action. This warning does not serve the purpose of a "precise and specific" claim, alerting defendants to still-live claims that would otherwise lapse. These letters are in the nature of a mere reminder, not a claim, *see Diaz de Diana v. A.J.A.S. Ins. Co.*, —— P.R.R. —— (1980), and do not come within § 5303.[9]

We also decline the invitation to reconsider *Gual Morales* and *Hernandez Del Valle*. The three reasons advanced for reconsidera-

---

**8.** See footnote 2 for the verbatim text of the letters.

**9.** We have no occasion to consider defendant Ramos's contention that, because the letters

were sent to Chardon at the Department of Education, Ramos never received them so that they could not in any event constitute extrajudicial claims as to him.

tion tend to merge. The first reason, the *Tomanio* case, which held that state tolling law applies to the state statute-of-limitations questions that arise in a § 1983 case, is said to require reconsideration because our earlier decisions incorrectly interpreted Puerto Rican law—the second reason for reconsideration—and because those decisions improperly took federal law into account—the third reason. We cannot and do not, of course, dispute *Tomanio*, but we do not believe that *Gual Morales* and *Hernandez Del Valle* violated its guidelines. Puerto Rican law does not, contrary to the plaintiffs' assertions, require a wider construction of "extrajudicial claim." Our decision in *Hernandez Del Valle* relied on two Commonwealth Supreme Court cases and one federal district court case from Puerto Rico. *Hernandez Del Valle v. Santa Aponte*, 575 F.2d at 323–24. In addition, the Puerto Rico Supreme Court recently observed that, because the "extrajudicial claim" provision of § 5303 constituted an exception to the extinguishment of actions, it should be construed narrowly. *Diaz de Diana v. A.J.A.S. Ins. Co.*, —— P.R.R. at —— & n.1. The commentators cited by plaintiffs, Diez-Picazo, La Prescripcion En El Codigo Civil 93–95, 130–31; 12 Manresa, Codigo Civil 1242–43 (1973), do not appear to urge a different interpretation. Diez-Picazo does state (in translation) that no particular form is required for an extrajudicial claim but goes on to discuss summonses, letters, and oral claims, matters of form not at issue here. We do not think that we have construed Puerto Rican law improperly.

Nor has federal law been read erroneously into § 5303. Plaintiffs object in particular to a passage in *Hernandez Del Valle v. Santa Aponte*, 575 F.2d at 323, that states that expansion of "extrajudicial claim" beyond interpretations given by courts in Puerto Rico would undermine the policy of repose underlying statutes of limitation. Plaintiffs' argument is essentially that "policy of repose" is a common law concept that cannot be used in construing the civil code. The commentary concerning tolling that is cited by plaintiffs, Diez-Picazo, *supra*, and

Manresa, *supra*, is certainly not inconsistent with the policy of repose, but in any case, it is clear that our decisions in *Hernandez Del Valle* and *Gual Morales* rested primarily on a fair reading of Puerto Rican decisions. *Gual Morales v. Hernandez Vega*, 604 F.2d at 733; *Hernandez Del Valle v. Santa Aponte*, 575 F.2d at 223–24. Plaintiffs also refer us to *Miller v. Smith*, 625 F.2d 43 (5th Cir. 1980) (per curiam), and *Brown v. Bigger*, 622 F.2d 1025 (10th Cir. 1980) (per curiam), for support for their position here. *Miller* simply reversed and remanded for reconsideration in light of *Tomanio*, a decision with which we already conform; *Brown v. Bigger* is to similar effect and does not persuade us to alter our conclusion.

■ The plaintiffs ask us alternatively to certify to the Puerto Rico Supreme Court the question of the tolling effect of the protest letters. Certification is a matter within the discretion of the court. *Lehman Bros. v. Schein*, 416 U.S. 386, 391, 94 S.Ct. 1741, 1744, 40 L.Ed.2d 215 (1974). It is particularly appropriate where a novel and unsettled question of state law is involved, and where the judges on the federal bench are geographically distant from that state or are otherwise unfamiliar with its law. *See id.* at 391, 94 S.Ct. at 1744; *Gual Morales v. Hernandez Vega*, 604 F.2d at 732–33; *Ruiz Rodriguez v. Litton Industries Leasing Corp.*, 574 F.2d 44, 46 (1st Cir. 1978). Among other functions, certification is meant to save "time, energy, and resources and helps build a cooperative judicial federalism." *Lehman Bros. v. Schein*, 416 U.S. at 391, 94 S.Ct. at 1744.

■ The cases at bar do not involve a matter of first impression in Puerto Rican law, *cf. Hendrickson v. Sears*, 495 F.2d 513, 514 (1st Cir. 1974) (per curiam) (certification of "question of first impression in Massachusetts law"); *Bose Corp. v. Consumers Union, Inc.*, 384 F.Supp. 600, 603 (D.Mass. 1974) (same), nor an issue where the law is unsettled, *cf. Hiram Ricker & Sons v. Students Internat'l Meditation Soc'y*, 501 F.2d 550, 557–58 & n.16 (1st Cir. 1974) (certification where extension of prior Maine deci-

sions was uncertain). The principle that an "extrajudicial claim" must be "precise and specific," *Jimenez v. District Court*, 65 P.R.R. at 42, that it must seek the same relief later sought in court, *Gual Morales v. Hernandez Vega*, 604 F.2d at 732–33; *Hernandez Del Valle v. Santa Aponte*, 575 F.2d at 323–24, has already been clearly laid down. We decline, therefore, to certify the issue to the Puerto Rico Supreme Court. *See Daigle v. Hall*, 564 F.2d 884, 886 (1st Cir. 1977) ("not particularly difficult" issue of state law does not require certification); *Oppenheimer Mendez v. Acevedo*, 512 F.2d 1373, 1375 (1st Cir. 1975) (where Puerto Rico law is clear, certification would be "hollow formality"). In every case, certification would help "build a cooperative judicial federalism," *Lehman Bros. v. Schein*, 416 U.S. at 391, 94 S.Ct. at 1744, by deferring to state courts, but the waste of time and energy in certifying the issue of "extrajudicial claim" here would be too great, *see id.*

Our ruling that the Ortiz Rivera class action tolled the statute of limitations during its pendency and caused it to run anew means that those *Fumero Soto* plaintiffs who received notice of termination within one year before the class action was filed, that is, after June 19, 1977, are not time-barred. The date of notice of termination is the triggering date under *Ricks* and *Rivera Fernandez*, not the protest letters. The *Fumero Soto* plaintiffs who received notice of termination before June 19, 1977, are time-barred. All the *Rivera Fernandez* plaintiffs received notice prior to June 19, 1977, and all those cases are time-barred.

*The Verdict and the Subsequent Order of the District Court*

There are four issues pertaining to the *Fumero Soto* plaintiffs who are not time-barred: whether the district court should have granted defendants' motion for judgment notwithstanding the verdict, Fed.R. Civ.P. 50(b); whether the general verdict should have been set aside because the answers to the special interrogatories were inconsistent with it, Fed.R.Civ.P. 49(b); whether the court erred in ordering the Commonwealth to make payments of back pay to plaintiffs; and whether the court erred in holding that the individual defendants should not pay damages.

To determine the sufficiency of the evidence, it is necessary first to set out the law concerning § 1983 liability. Liability may be grounded on negligence alone. *Parratt v. Taylor*, 451 U.S. 527, 532–35, 101 S.Ct. 1908, 1911–12, 68 L.Ed.2d 420 (1981).

> Accordingly, in any § 1983 action the initial inquiry must focus on whether the two essential elements to a § 1983 action are present: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.

*Id.* at 535, 101 S.Ct. at 1913. The first element raises several issues, among them whether there is a sufficient causal connection between defendant's acts and the alleged injury. There is also a related, though strictly extraneous issue, whether defendant enjoys immunity from damages, which we discuss below concerning the remedy in the instant cases. With respect to causality, there usually must be an affirmative link between acts of misconduct and plans or policies promulgated by the defendant, *Rizzo v. Goode*, 423 U.S. 362, 371, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976); defendant must commit the constitutional tort himself or "cause" another to commit the tort, *Monell v. Department of Social Servs.*, 436 U.S. 658, 692, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). Defendant will be liable for failures to meet his statutory responsibilities that amount to constitutional violations, *DiMarzo v. Cahill*, 575 F.2d 15, 17–18 (1st Cir.), *cert. denied*, 439 U.S. 927, 99 S.Ct. 312, 58 L.Ed.2d 320 (1978), and actual knowledge of the resulting violations is unnecessary. *Id.* at 18 & n.3; *Tatum v. Houser*, 642 F.2d 253, 254 (8th Cir. 1981) (per curiam). Plaintiff may prove that defendant was derelict in supervising a subordinate whose acts caused constitutional injury. Such supervisory liability is ill-

defined. *See Naughton v. Bevilacqua*, 605 F.2d 586, 589 (1st Cir. 1979). A superior will not be liable for undirected, sporadic acts of subordinates, *Layne v. Vinzant*, 657 F.2d 468, 471 & n.3 (1st Cir. 1981), but he will be liable where violations are so pervasive that a dutiful supervisor would have notice of them, *Naughton v. Bevilacqua*, 605 F.2d at 589. Mere failure to supervise is not a basis for liability under § 1983, *Owens v. Haas*, 601 F.2d 1242, 1246 (2d Cir. 1979), citing *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561, but if delinquent supervision is so severe as to amount to gross negligence or deliberate indifference to constitutional violations, then liability will result, *Owens v. Haas*, 601 F.2d at 1246. "Section 1983 will not support a claim based on a *respondeat superior* theory of liability. *Monell v. Department of Social Services*, 436 U.S. 658, 694, [98 S.Ct. 2018, 2037, 56 L.Ed.2d 611] (1978)." *Polk County v. Dodson*, —— U.S. ——, ——, 102 S.Ct. 445, 453, 70 L.Ed.2d 509 (1981).

■ The evidence, viewed in the light most favorable to the plaintiffs, showed the following. In early May, 1977, a memorandum was sent out over the signature of Virginia Belaval, an assistant to Chardon, to undersecretaries, deputy secretaries, and regional directors in the Department, informing them that nonpermanent positions in the Department would be filled by competition for the 1977–78 school year and that recommendations for retaining current nonpermanent employees should be sent with "appropriate justifications." Ramos and others actually prepared the memorandum, basing it on similar memoranda sent out at this time in earlier years. Chardon saw the memorandum and discussed it with Belaval. Some recommendations were received. At the end of May, Ramos ordered Julio Cintron Lopez to sign letters of demotion that were going to "clean out" members of the PDP in temporary positions. Cintron Lopez resisted but eventually complied; thereafter he was excluded from ac-

tivities in the Department. At some point, probably in the summer, Chardon saw some of the letters. The letters had the desired cleaning-out effect: the demoted plaintiffs were members of the PDP or unaffiliated with the NPP; they were replaced by NPP members. In particular, one regional director told Jose Surillo Rodriguez that he was being demoted because the NPP wanted to place its own member in his position but that Surillo Rodriguez could seek reappointment if he were willing to cooperate with the NPP. When the demoted teachers returned protest letters, Belaval heard their complaints, conducted brief investigations, and discussed some cases with Chardon. Chardon instructed Belaval, however, that unless she could persuade the regional directors to change their recommendations, their decisions would stand. At some time during his tenure as Secretary, Chardon spoke to a group of deputy superintendents and school principals. He was asked about the changes and demotions that had occurred in the Department, and he remarked that the PDP had left a great many "vacuums" or vacancies and that the NPP would take care that PDP members would not fill them. Chardon testified that he was referring only to 300 school director positions that were truly vacant at the time.[10]

This evidence is less than overwhelming, but we believe that it was sufficient to enable the jury to conclude that Chardon and Ramos had the necessary causal connection—or, as Chardon and Ramos put it, "personal involvement"—with the demotions to render themselves liable. Chardon is the more difficult case. He testified about his inability to control employees of the Department, and there was evidence about the Department's "decentralization policy:" accepting the decisions of local (and otherwise inferior) officials as final. The critical evidence was Chardon's statement that the NPP would keep the PDP out of Department positions; the jury was

**10.** Plaintiffs argue incorrectly that evidence available to the jury included defense counsel's "concession" that certain testimony "tied Chardon . . . into the personal involvement pat-

tern." Statements of counsel are not evidence; plaintiffs' more egregious error is that the jury was not in the courtroom at the time the statement was made.

entitled to credit Rivera Fernandez's testimony over Chardon's about the statement. From this, the jury could have concluded that Chardon avoided making changes in or interfering with Department activities that, under the prevailing policies, he knew would operate to demote employees on the basis of their political affiliation. *See Rizzo v. Goode,* 423 U.S. at 371, 96 S.Ct. at 604 (need for affirmative link between misconduct and policies implemented by defendants). This is not a case of "the mere right to control without any control or direction having been exercised and without any failure to supervise." *Monell v. Department of Social Servs.,* 436 U.S. at 694 n.58, 98 S.Ct. at 2037 n.58.

The case against Ramos is stronger: he took charge of dispatching the demotion letters that he knew would "clean out" PDP members. The jury could have characterized his conduct as an act that directly caused constitutional injury to the plaintiffs.

We affirm the district court's denial of defendants' motion for judgment notwithstanding the verdict.

The next issue, the alleged inconsistency between the answers to the special interrogatories and the general verdict, requires an examination of the court's instructions to the jury. We have no difficulty with the instructions, to which no objections were made. It is necessary, however, to restate certain sections of the charge in order to understand the inconsistency claim and our ruling on damages.

The district court instructed the jury that one of the essential facts plaintiffs had to prove was

> that the defendant demoted him from the position that he held during the '76–'77 school year because of his political affiliation and of his activity in the affairs of the Popular Democratic Party or the—a political party other than the NPP.
>
> In other words, that plaintiff's political affiliation or activity in the affairs of his party was a substantial and/or motivating factor in the defendant's decision to demote him back to his permanent status[.]

On the question of immunity, the court instructed:

> The Commonwealth officials who are defendants in this case are not immune from liability for actions taken under Section 1983 if that official knew or should have known that the action taken within his sphere of official responsibility would violate the Constitutional or legal rights of the teachers affected, *or* if the official took the action with the malicious intention of causing a deprivation of Constitutional or legal rights or other injury to the teachers. (emphasis added).

After the case was submitted to the jury, there was a lengthy discussion between the court and counsel as to how damages would be handled if the jury found liability. The court was concerned because "we have got 55 cases, and it is beyond physical endurance for that same jury to come back and try 55 damage trials." During the discussion, the court opined "that there must be a finding of malicious intention to justify punitive damages." Counsel ultimately agreed, with the court's approval, that in the event the jury found defendants liable "that a new or second jury can be summoned to try the respective damages claims." The record does not disclose any discussion of special interrogatories.

After the general verdict was received, the court told the jury that it wanted it to determine "whether or not these acts were done with a malicious intent." It then defined malicious intent:

> Malice is the intentional doing of a wrongful act without just cause or excuse with an intent to inflict an injury or under circumstances that the law will imply an evil intent.
>
> Maliciousness does not necessarily mean actual malice or ill-will, but intentional doing of a wrongful act without legal or social justification.

The jury was then told to answer the following question as to each defendant. "Did the defendant have a malicious intent to deprive plaintiffs of their constitutional or other rights?" There was no objection.

The jury answered in the negative as to both defendants and was then discharged. Immediately after the jury left, counsel for the defendants moved for judgment notwithstanding the verdict "pursuant to Federal Rule 52(b)" on the ground that the special findings contradicted the general verdict.

It is Federal Rule of Civil Procedure 49(b) that covers the problem of inconsistencies between special interrogatories and the general verdict. Federal Rule of Civil Procedure 52(b) applies only where findings are made by the court in the first instance. The use of special interrogatories should have put counsel on notice that the provisions of Federal Rule of Civil Procedure 49 applied. Under Rule 49(b),[11] objections to the inconsistency of verdicts must be made before the jury is discharged or by motion to resubmit to the jury. *Skillin v. Kimball*, 643 F.2d 19, 19–20 (1st Cir. 1981); *see Stancill v. McKenzie Tank Lines, Inc.*, 497 F.2d 529, 534–35 (5th Cir. 1974); *Ludwig v. Marion Laboratories, Inc.*, 465 F.2d 114, 118 (8th Cir. 1972); *Barnes v. Brown*, 430 F.2d 578, 580 (7th Cir. 1970). The purpose of the rule is plain: to promote the efficiency of trials by allowing the original deliberating body to reconcile inconsistencies without the need for a new presentation of evidence to a different body. *Skillin v. Kimball*, 643 F.2d at 20. In the case at bar, counsel waited until after the jury was excused before raising the inconsistency claim. Defendants have, therefore, waived their right to have the general verdict set aside on this ground.

Even had defendants not waived their inconsistency claim, we would agree with the district court that the general verdict and the answers to the special interrog-

atories were not inconsistent. It is clear from reading the record that the district court submitted these questions to determine if punitive damages should be awarded. As the district court pointed out in its lengthy post-trial memorandum, the jury could have based its general verdict of liability on the ground that the defendants knew or should have known that their actions would violate the constitutional or legal rights of the teachers *or* that they acted with malicious intent. Immunity Instruction, *supra*, at 25. We agree with the district court that the only effect of the answers to the special interrogatories was to rule out punitive damages.

We now come to the post-trial order of the district court. In rejecting defendants' motion for judgment notwithstanding the verdict, the court issued two orders. It directed the Department of Education of the Commonwealth to reinstate all plaintiffs to the positions held at the time of their demotions. This order has been neither briefed nor argued on appeal. The court also ordered the Department of Education to pay all plaintiffs full back pay. The court then ruled that "as a matter of law and in light of the jury's factual finding that the defendants did not have a malicious intent to deprive plaintiffs of their rights, the relief herein granted exhausts the remedies and damages available to plaintiffs." Although we can understand the court's desire to dispatch the case in one fell swoop, we think the ruling was erroneous.

We turn first to the back pay award: whether the Commonwealth could be liable for it.[12] We are guided in answering the first question by P.R.Laws Ann. tit. 32, § 3085, which provides as follows:

---

**11.** Fed.R.Civ.P. 49(b) provides in pertinent part as follows:

> *General Verdict Accompanied by Answer to Interrogatories.*
> . . . When the answers are consistent with each other but one or more is inconsistent with the general verdict, judgment may be entered pursuant to Rule 58 in accordance with the answers, notwithstanding the general verdict, or the court may return the jury for further con-

sideration of its answers and verdict or may order a new trial.

**12.** The district court denied defendants' motion to amend the judgment by vacating or rescinding the back pay award on the ground that the motion was untimely. We are not, however, foreclosed from considering defendants' attack on the judgment. *See Evans v. Suntreat Growers & Shippers, Inc.*, 531 F.2d 568, 570 (Em. App.1976).

Every official, ex-official, employee or ex-employee of the Commonwealth of Puerto Rico who is sued for damages in his personal capacity, when the cause of action is based on alleged violations of the plaintiff's civil rights, due to acts or omissions committed in good faith, in the course of his employment and within the scope of his functions, may request the Commonwealth of Puerto Rico to provide him with legal representation, and to subsequently assume the payment of any judgment that may be entered against his person. Executive Directors, ex-Executive Directors, members and ex-members of the Governing Boards of public corporations and Government instrumentalities, mayors and ex-mayors shall be covered by these provisions, except that for the payment of judgments, they shall be governed by the provisions of section 3092 of this title. Any action brought under the provisions of sections 3077–3084 of this title shall not be covered by the provisions of this section.

Likewise, these provisions shall not be construed, for any reason whatsoever, as making the Commonwealth an insurer of the aforesaid public services, nor as a waiver of the sovereign immunity of the Commonwealth.

Puerto Rico not having waived its sovereign immunity, the award against its Department of Education cannot stand.[13] In a § 1983 action, "a federal court's remedial power, consistent with the Eleventh Amendment, is necessarily limited to prospective injunctive relief ... and may not include a retroactive award which requires the payment of funds from the state treasury." *Edelman v. Jordan*, 415 U.S. 651, 677, 94 S.Ct. 1347, 1362, 39 L.Ed.2d 662 (1974). *See Quern v. Jordan*, 440 U.S. 332, 341, 99 S.Ct. 1139, 1145, 59 L.Ed.2d 358 (1979); *Fitzpatrick v. Bitzer*, 427 U.S. 445, 452, 96 S.Ct. 2666, 2669, 49 L.Ed.2d 614 (1976). The district court concluded that the back pay award in the *Fumero Soto* cases was nevertheless permissible because it was "ancillary" to the prospective relief

of reinstatement. We cannot agree. The back pay and reinstatement remedies are entirely distinct; indeed, plaintiffs no longer with the Department of Education and not reinstated were held entitled to back pay. It is plainly retroactive relief requiring the payment of funds from the state treasury. Moreover, "ancillary" monetary relief that is appropriate against a state, *Quern v. Jordan*, 440 U.S. at 337, 99 S.Ct. at 1143, is far different from the relationship between back pay awards and other equitable relief that justifies a grant of back pay against bodies that do not enjoy sovereign immunity, *see Gurmankin v. Costanzo*, 626 F.2d 1115, 1121–22 (3d Cir. 1980), *cert. denied*, 450 U.S. 923, 101 S.Ct. 1375, 67 L.Ed.2d 352 (1981) (approving back pay award as part of remedy in § 1983 and Title VII case) and cases cited therein. It was on this second, looser relationship that the district court erroneously relied.

Plaintiffs argue that the eleventh amendment proscription does not apply where a state may use federal funds to pay damages. The cases cited are instances where the state could seek reimbursement from the federal government, *Harrington v. Blum*, 483 F.Supp. 1015, 1021–22 (S.D.N.Y. 1979), *aff'd*, 639 F.2d 768 (2d Cir. 1980), where a back pay award is at issue and the state job position was federally funded, *Witter v. Pennsylvania Nat'l Guard*, 462 F.Supp. 299, 306 n.9 (E.D.Pa.1978), or where state funds are held in a separate account for an historical society and an award limited to those funds will not affect the state's budgetary decisions, *Morrow v. Sudler*, 502 F.Supp. 1200, 1203–04 (D.Colo.1980). These decisions are arguably sound: where the state will be unaffected by an award, its consent to suit and waiver of sovereign immunity seem unnecessary. These decisions, however, do not reach the instant cases where plaintiffs show that at most state and federal funds are intermingled. *Cf. Florida Dep't of Health & Rehabilitation Servs. v. Florida Nursing Home Ass'n*, 450 U.S. 147, 150, 101 S.Ct. 1032, 1034, 67

---

**13.** The Commonwealth enjoys the full benefits of the eleventh amendment. *Ezratty v. Commonwealth of Puerto Rico*, 648 F.2d 770, 776 n.7 (1st Cir. 1981).

L.Ed.2d 132 (1981) (per curiam) (state participation in federally funded public aid program does not amount to waiver of sovereign immunity). The Commonwealth here cannot avoid using state funds to pay the award, and its budget will be affected. We, therefore, hold the back pay award against the Department of Education barred by the eleventh amendment.

The final issue is the court's ruling that because of the jury finding of lack of malicious intent, plaintiffs were not entitled to any damages from Chardon and Ramos. Unlike most civil rights damage cases, the individual defendants here never asserted a good faith defense. Their defense was that the demotions were for nonpolitical reasons. The district court pointed this out in its post-trial memorandum, and our review of the record confirms its finding. There is, therefore, no question of immunity, absolute or qualified, to be considered. We think the district court's ruling that lack of malice precluded compensatory damages was incorrect. The instructions to the jury, already quoted, and its general verdict rendered the defendants liable for compensatory damages. In *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), the seminal § 1983 civil rights case on damages against individual defendants, the Court held:

> [T]he appropriate [immunity] standard necessarily contains elements of both ["objective" and "subjective" good faith]. The official himself must be acting sincerely and with a belief that he is doing right, but an act violating a student's constitutional rights can be no more justified by ignorance or disregard of settled, indisputable law on the part of one entrusted with supervision of students' daily lives than by the presence of actual malice.

*Id.* at 321, 95 S.Ct. at 1000.

 Here, the defense was neither good faith nor ignorance; defendants simply claimed that they did not violate the

law. The jury found otherwise. Compensatory damages follow as a matter of course. Denial of punitive damages because of lack of malicious intent is no bar to liability for compensatory damages on the part of defendants who cannot survive the "ignorance or disregard" prong of the *Wood* test. *Cf. Morris v. Travisono*, 528 F.2d 856, 857 (1st Cir. 1976) (noting unappealed award of compensatory damages against three defendants but punitive damages against only two); *Smith v. Losee*, 485 F.2d 334, 344 (10th Cir. 1973) (in banc), *cert. denied*, 417 U.S. 908, 94 S.Ct. 2604, 41 L.Ed.2d 212 (1974) (defendant indirectly responsible for political discrimination by other defendants against plaintiff is liable for actual damages but not for punitive damages); *Stolberg v. Members of Bd. of Trustees for State Colleges*, 474 F.2d 485, 489 (2d Cir. 1973) (actual but not punitive damages awarded in political discrimination case); *Aumiller v. University of Delaware*, 434 F.Supp. 1273, 1311–12 (D.Del.1977) (against defendant official who cannot invoke qualified immunity plaintiff must still prove malice or wanton disregard of constitutional rights in order to recover punitive damages).

The *Fumero Soto* cases not time-barred must be remanded for a jury trial on compensatory damages.

*Summary*

In Nos. 80–1237, et al., *Rafael Rivera Fernandez et al. v. Chardon, et al.*, the judgments are vacated and all the cases are remanded to the district court with instructions to dismiss.\*\*\*

In Nos. 81–1567 and 81–1607, *Juan Fumero Soto, et al. v. Chardon, et al.*, the liability judgment in favor of those plaintiffs who received letters of notice of demotion on June 17, 1977, or thereafter is affirmed and the matter is remanded for assessment of compensatory damages against the individual defendants, Chardon and Ramos. This is a jury determination unless the parties agree otherwise. The judgment in the

---

\*\*\* Judges Campbell and Breyer, not having participated in 81–1567 and 81–1607, join in only

so much of the opinion as relates to 80–1237.

cases in which the plaintiffs received letters of demotion prior to June 19, 1977, is reversed and the matter is remanded with instructions to dismiss.

No costs to any party.

*Judgments accordingly.*