Kenneth CONRAD, et al., Plaintiffs,

v.

Cesar PERALES, individually and as State Commissioner of the New York State Department of Social Services; et al., Defendants.

No. 91–CV–846C.

United States District Court,
W.D. New York.

March 24, 2000.

Legal Services for the Elderly (Anthony Szczygiel, of counsel), Buffalo, NY, for Plaintiffs.

Eliot Spitzer, Attorney General of the State of New York (William D. Lonergan, Assistant Attorney General, of counsel), Buffalo, NY, for Defendants.

## DECISION AND ORDER

CURTIN, District Judge.

### INTRODUCTION

On December 20, 1991, plaintiffs Conrad, Lisman, and Belote, as representatives of a purported class ("plaintiffs"), commenced this action against Cesar Perales ("the Commissioner"), both individually and in his official capacity as Commissioner of the New York State Department of Social Services ("NYS DSS"). Plaintiffs allege that in 1989, the Commissioner wrongfully converted plaintiffs' Medicaid "client shares" ("NAMIs")[1] and/or their Medicare benefits.[2]

On July 29, 1993, the court granted plaintiffs' motion to certify the class, which consists of all individuals who received payment from both Medicare and New York's Medicaid program ("MA") during any month of 1989.[3] Item 32. For the next several years, discovery proceeded slowly, as attorneys for the plaintiff class worked to identify the members of the class and the damages that they may have incurred.

On December 16, 1998, the court ordered the attorneys for plaintiffs to file "any motion or motions they believe will help advance this litigation . . . ." Item 103. Accordingly, on February 17, 1999, plaintiffs' attorney, Anthony Szczygiel, Esq., filed a motion for summary judgment. Item 105. The Commissioner by his attorney, Assistant State Attorney General William Lonergan, Esq., submitted opposing papers on May 17, 1999. Items 111–14. Plaintiffs then submitted a statement of undisputed facts as well as a reply memorandum of law. Items 118–20. The Commissioner has also submitted a statement of undisputed facts. Item 115. In addition, both parties have since submitted memoranda of law which address the issue of the Commissioner's Eleventh Amendment immunity. Items 122–23. On September 30, 1999, the Commissioner filed his own motion for summary judgment and incorporated all of his prior submissions as support. Item 125. On October 8, 1999, and December 17, 1999, the court heard oral argument on both parties' summary judgment motions. After oral argument, the parties were permitted to submit additional written arguments. Items 133–35. The court has considered the parties various submissions and arguments, and now renders its decision.

---

1. Client shares are also called "Net Available Monthly Income" ("NAMIs"). NAMIs are a sort of co-pay that skilled nursing facilities (SNFs) require Medicaid-qualified patients to contribute towards their care.

2. Plaintiffs contend that the wrongfully converted Medicare benefits should have covered certain costs of plaintiffs' care at various nursing homes.

3. Plaintiffs' eligibility for both Medicare and New York State Medicaid made plaintiffs so-called "dual eligibles."

## BACKGROUND

### I. Medicare Catastrophic Coverage Act of 1988

New York State's "Medicare Optimization Plan II" ("MOP II") precipitated plaintiffs' claims against the Commissioner. In 1988, the NYS DSS developed MOP II in response to the state nursing home industry's concerns regarding changes in federal Medicare law. *See* Item 106, ¶ 17. The nursing home industry had grown concerned because of the Medicare Catastrophic Coverage Act of 1988, which was set to expand Medicare eligibility and coverage for care in skilled nursing facilities ("SNFs") from 100 days within a beneficiary's lifetime to 150 days each year. *See* Item 114, Ex. A, ¶ 3. In addition, federal Medicare laws required participating SNFs to accept Medicare reimbursement in full satisfaction of a patient's covered services. *See* Item 106, Ex. A. The upshot of the Medicare Catastrophic Coverage Act of 1988, then, was that participating SNFs would be forced to accept Medicare reimbursement, and only Medicare reimbursement, for an increased number of patients and an increased number of services. *See* Item 114, Ex. A, ¶ 3.

This development concerned the nursing facility associations because Medicare reimbursement rates tended to be lower than New York State's MA reimbursement rates. It was also a source of concern because nursing facilities expected to wait longer to receive Medicare payments than they did to receive MA payments. *See id.* ¶¶ 6–7.

### II. New York State's "MOP II"

In response to these concerns, NYS DSS developed MOP II. *See id.* ¶ 14. Among other things, MOP II permitted nursing facilities to "pay and chase," which means that MOP II allowed nursing facilities to bill Medicare and MA simultaneously for the same services. *See id.;* Item 113, ¶ 11. Further, MOP II authorized nursing homes to retain the higher of either the Medicare payment or the total of the MA payment and the patient's NAMI.

*See* Item 106, Ex. E. Under MOP II, the nursing facilities were required to remit the lesser of the Medicare and MA payments to NYS DSS. When nursing facilities refunded the MA payment to NYS DSS, that refund would have included the patient's NAMI. *See* Item 106, ¶ 47.

## DISCUSSION

### I. Claims Against the Commissioner in Official Capacity

#### A. State Officials and Eleventh Amendment Immunity

An action against a state official in his or her official capacity is, in essence, an action against the state. As a result, state officials who are sued in their official capacities enjoy Eleventh Amendment immunity in much the same way the state does. *See Will v. Michigan Dept. of State Police,* 491 U.S. 58, 89, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (recognizing that "an official-capacity action is in reality always against the State").

Plaintiffs insist that the Commissioner is not entitled to Eleventh Amendment immunity because NYS DSS, as the state Medicaid agency, is not actually an "arm of the state." In support of this position, plaintiffs have offered a critique of the diversified bureaucratic structure of NYS DSS as the state Medicaid agency. *See* Item 120, pp. 10–12. However, plaintiffs cite no case law to support the proposition that NYS DSS is not an arm of New York State.

The court's research, on the other hand, reveals that courts have implicitly recognized that NYS DSS, as the state Medicaid agency, and the Commissioner are both arms of New York State. *See, e.g., Tekkno Laboratories, Inc. v. Perales,* 933 F.2d 1093, 1097 (2d Cir.1991); *Community Health Care Ass'n of New York v. DeParle,* 69 F.Supp.2d 463, 473 (S.D.N.Y. 1999). As such, the court rejects plaintiffs' argument that NYS DSS is not actually an arm of New York State and that, as a result, the Commissioner cannot qualify for Eleventh Amendment immunity.

## B. *Edelman v. Jordan* and Eleventh Amendment Immunity

In *Edelman v. Jordan*, the Supreme Court set forth the now well-settled rule that "a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment." 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). More recently, the Second Circuit has elaborated on *Edelman*: "The Eleventh Amendment provides a state, as well as its agencies and its officials acting in their official capacities, with protection from suits in federal court for damages for past wrongs. In general, federal suits against such defendants for monetary awards out of state funds are barred." *Tekkno Laboratories*, 933 F.2d at 1097 (citing *Edelman* ).

At oral argument, plaintiffs cited a number of cases in an effort to evade *Edelman*'s prohibition on retroactive money awards against the state. First, plaintiffs' counsel argued that the Second Circuit has held that Medicaid recipients can sue in federal court for a retroactive money award based on wrongly withheld Medicaid benefits. *See Holley v. Lavine*, 605 F.2d 638 (2d Cir.1979). The court has reviewed *Holley* and disagrees with plaintiffs' overly expansive reading. In *Holley v. Lavine*, 464 F.Supp. 718 (W.D.N.Y. 1979), this court dismissed the plaintiffs' claims against the State Commissioner of Social Services on the grounds of Eleventh Amendment immunity. *Id.* at 722–23. The plaintiffs cross-appealed that decision. The court of appeals dismissed the plaintiffs' cross-appeal and upheld this court's decision to confer Eleventh Amendment immunity on the State Commissioner. *Holley*, 605 F.2d at 642. Thus, *Holley* offers no help to plaintiffs in this case.

Plaintiffs' counsel also urged this court to consider the Supreme Court's decisions in *McKesson Corp. v. Division of Alcoholic Beverages and Tobacco*, 496 U.S. 18, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990); and *Reich v. Collins*, 513 U.S. 106, 115 S.Ct. 547, 130 L.Ed.2d 454 (1994). Plaintiffs state that under *McKesson* and *Reich*, federal courts may order states to pay retroactive money awards when states wrongfully collect money under an illegal tax scheme. Plaintiffs insist that the holdings in *McKesson* and *Reich* support their position that this court may order New York to repay the remitted NAMIs, which plaintiffs claim were collected under MOP II's illegal pay and chase system.

The court has reviewed both *McKesson* and *Reich* and finds that plaintiffs' reliance on these cases is in error. The error in plaintiffs' *McKesson/Reich* argument is simple: they have failed to account for the fact that both *McKesson* and *Reich* were commenced in *state court* systems and made their way through those state court systems before the Supreme Court granted certiorari. *See McKesson*, 496 U.S. at 22, 25–26, 110 S.Ct. 2238; *Reich*, 513 U.S. at 108–09, 115 S.Ct. 547. "No Eleventh Amendment question is present, of course, where an action is brought in a state court . . . ." *Maine v. Thiboutot*, 448 U.S. 1, 9 n. 7, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). In *Reich*, the Court provided language that confirms the error in plaintiffs' argument: "We should note that the sovereign immunity States enjoy in *federal* court, under the Eleventh Amendment, does generally bar tax refund claims from being brought in that forum." 513 U.S. at 110, 115 S.Ct. 547. In light of the foregoing, the court finds *Holley, McKesson,* and *Reich* inapposite to the present action.

## C. Federal Reimbursement and Eleventh Amendment Immunity

Certain courts have held that the Eleventh Amendment immunity enunciated in *Edelman* does not apply if the federal government will reimburse the state for all or part of a retroactive money judgment. For example, *Bennett v. White*, 865 F.2d 1395 (3d Cir.1989), involved a plaintiff class of AFDC recipients who had assigned their rights to receive child support to the state of Pennsylvania. Apparently, Pennsylvania then collected the assigned child support payments and used them to defray

the costs of providing AFDC. The *Bennett* plaintiffs claimed that Pennsylvania broke the law by failing to pay them statutorily mandated "pass-through payments" out of the collected child support payments.

The *Bennett* court found that the Eleventh Amendment did not completely immunize Pennsylvania. The court reasoned that if Pennsylvania was required to account for and disgorge the wrongfully withheld pass-through payments, then Pennsylvania would incur higher AFDC obligations in the next fiscal quarter. Under title 42 of the United States Code, the federal government would then reimburse Pennsylvania for about 50 percent of those increased AFDC expenditures. *Id.* at 1398. Thus, "a decrease in child support payments retained by the state [would] result in increases in federal AFDC payments in the next quarter ... in an amount of about fifty percent of the decreases." *Id.* at 1408.

The court thus concluded that the Eleventh Amendment barred the plaintiffs' claims only to the extent that the plaintiffs sought retroactive monetary relief from the state fisc. However, the court also found that Pennsylvania enjoyed no immunity to the extent that the state would be reimbursed by the federal government. *See id.* at 1407–08. The court concluded: "A federal court may order state disgorgement—retroactive relief—when such relief will be at the expense of the federal government, not the state ...." *Id.* at 1408.

In *Harrington v. Blum*, 483 F.Supp. 1015 (S.D.N.Y.1979), the district court utilized similar reasoning to find that the Eleventh Amendment did not bar a retroactive money award against the state for wrongly denied food stamp benefits. The court found that there was no Eleventh Amendment immunity because, by law, the federal government would ultimately pay for all of the wrongly denied food stamp benefits. *Id.* at 1021–22; *see also Bermudez v. U.S. Department of Agric.*, 490 F.2d 718 (D.C.Cir.1973). The court finds that under *Bennett*, *Harrington*, and *Bermudez*, the Eleventh Amendment does not bar a claim for retroactive damages against a state when the federal government will ultimately reimburse all or part of a money judgment against the state.[4]

With respect to this case, it is true that the federal government partially reimburses the states for many of the costs associated with providing Medicaid benefits. *See generally* 42 U.S.C.A. § 1396b (West 1992 & Supp.1999). The federal share of the states' Medicaid costs is known as "federal financial participation" ("FFP"). 42 C.F.R. § 400.203 (1999). Both Congress and the Secretary of Health and Human Services, however, have delimited the kinds of Medicaid costs for which FFP is available. The court has reviewed the statutory and regulatory provisions regarding FFP. For the reasons discussed *infra*, the court finds that New York State would not be entitled to FFP if the state were ordered to refund the NAMIs that were allegedly remitted to it.[5]

---

4. Plaintiffs have also argued that the Eleventh Amendment should not bar this suit because federal funds are at issue. Under this theory, plaintiffs liken this action to a "suit by the federal government against a state, which falls outside the Eleventh Amendment." Item 120, pp. 5–6. The court finds no support for this theory in statutory or case law. Rather, the key issue in cases like *Bennett* and *Blum* is whether the federal government will reimburse a state for its liability, not whether "federal funds" are involved in a suit against the state. Thus, the court rejects the proposition that there is an exception to Eleventh Amendment immunity when the improper di-

version or conversion of federal funds is at issue.

5. The Commissioner has offered his own theory on why the state would not be reimbursed by the federal government for a retroactive money award. *See* Item 133. Principally, the Commissioner relies on the Second Circuit's decision in *Florence Nightingale Nursing Home v. Perales*, 782 F.2d 26, 29 (2d Cir.1986). There, nursing homes in New York State claimed that Medicaid should cover the financial shortfall that the nursing homes experienced when they were unable to collect NAMIs from their patients. The court

FFP is available for the costs of providing medical services to Medicaid recipients and for the costs of administering a Medicaid program. 42 U.S.C.A. § 1396b(a)(1)-(7) (West 1992 & Supp.1999). With respect to FFP for medical services, Congress has provided: "[T]he Secretary ... shall pay to each State which has a plan approved under this subchapter, ... (1) an amount equal to the Federal medical assistance percentage ... of the total amount expended during such quarter *as medical assistance* under the State plan ...." *Id.* § 1396b(a)(1) (emphasis added). Obviously, the costs associated with medical services would be a far cry from the cost of paying an award in this case. There is no argument to be made that the state could receive FFP for medical services if the state was ordered to refund plaintiffs' NAMIs.

However, states also receive federal reimbursement for the costs associated with administering their Medicaid programs. According to the statute, the administrative costs for which FFP is available include: (1) the costs of "training ... skilled medical personnel, and staff directly supporting such personnel," 42 U.S.C.A. § 1396b(a)(2)(A) (West 1992 & Supp.1999); (2) the costs of "preadmission screening and resident review conducted by the State," *id.* § 1396b(a)(2)(C); (3) the costs of overseeing and monitoring nursing facilities, *id.* § 1396(a)(2)(D); (4) the costs associated with "the design, development, or installation of ... mechanized claims processing and information retrieval systems ...," *id.* § 1396b(a)(3)(A)(i); (5) the costs of providing "medical and utilization review or quality review," *id.* § 1396b(a)(3)(C); (6) the costs associated with "the establishment and operation of

... a State medicaid fraud control unit," *id.* § 1396b(a)(6); and (7) "an amount equal to 50 per centum of the remainder of the amounts expended ... as found necessary by the Secretary for the proper and efficient administration of the State plan," *id.* § 1396b(a)(7).

First, the court observes that the FFP guidelines set forth in section 1396b(a)(2)-(6) deal strictly with reimbursing the costs associated with specific administrative tasks and programs. The court finds that the reimbursement provisions in section 1396b(a)(2)-(6) could not extend to New York's potential obligation to refund wrongfully collected NAMIs.

█ Plaintiffs insist that the state could make a claim for FFP pursuant to section 1396b(a)(7). *See* Item 135. The court acknowledges that section 1396b(a)(7) is something of a "catchall" provision. However, the catchall in subsection (a)(7) relates only to costs that are "necessary ... for the proper and efficient administration of the State plan." The court fails to see how the process of refunding wrongfully collected NAMIs would relate to the "proper and efficient" administration of the state's plan. Rather, such costs would arise from an error in developing and implementing regulatory policy.

Again, the court finds that Congress intended FFP to be available principally for administrative methods and strategies, not for costs arising from the kind of policy-based errors alleged in this action. Subsections (a)(2) through (7) of section 1396b demonstrate that administrative costs include costs like paying, supervising, and training the state agency's staff; monitoring the performance and billing prac-

---

of appeals rejected this argument and found that care providers had no right to Medicaid reimbursement on the basis of uncollected NAMIs. In this case, the Commissioner relies on *Nightingale* for the proposition that no federal reimbursement would be forthcoming for an award against the state. The Commissioner's argument misses the mark. Under *Nightingale,* it is true that the state would not receive FFP if the state opted to pay nursing

homes for NAMIs that the nursing homes failed to collect. However, the facts in this case raise a markedly different question: whether the state would receive federal reimbursement if the state refunded the NAMIs that were wrongfully collected and retained by the state. Thus, the court rejects the Commissioner's reliance on *Nightingale* and instead looks to the statute and regulations for an answer to the question raised in this case.

tices of care providers; and processing claims from recipients. In other areas of the statute, Congress describes "the administration" of a State plan in this way:

A State plan for medical assistance must ... provide (A) such *methods* of administration (including *methods* relating to the establishment and maintenance of *personnel standards* on a merit basis ..., and including provision for utilization of professional medical personnel in the administration and, where administered locally, *supervision* of administration of the plan) as are found by the Secretary to be necessary for the proper and efficient operation of the plan ....

42 U.S.C.A. § 1396a(a)(4)(A) (West 1992 & Supp.1999) (emphasis added).

Finally, the regulations governing FFP reveal that it is meant to defray only certain kinds of costs, such as: (1) the cost of providing fair hearings for recipients who seek to challenge the denial of benefits, 42 C.F.R. § 431.250 (1999); (2) the cost of providing "[c]ompensation and training of skilled professional medical personnel ...," *id.* § 433.15(b)(5); and (3) the cost of the equipment that the state needs to administer its Medicaid program, *id.* § 433.35.

In sum, nothing in the governing statute or regulations indicates that FFP might extend to the cost of reimbursing NAMIs that NYS DSS wrongfully collected and retained.[6] Given the facts of this case, the court concludes that FFP would not be available to the Commissioner or NYS DSS. As a result, plaintiffs cannot show

that the Commissioner should lose Eleventh Amendment immunity because of the availability of partial or total federal reimbursement.

### D. Converted Funds and Eleventh Amendment Immunity

Plaintiffs also posit that the Commissioner cannot invoke Eleventh Amendment immunity when the state has unlawfully converted funds that rightly belonged to private citizens. To support this position, plaintiffs cite *Beasley v. Harris,* 671 F.Supp. 911 (D.Conn.1987). The facts in *Beasley* are very much like the facts in *Bennett v. White,* 865 F.2d 1395. Both cases involved the state's failure to send "pass-through payments" to AFDC recipients. The court in *Beasley* acknowledged the authority of *Edelman,* but departed from *Bennett* and*Edelman,* reasoning:

[The] wrongly withheld pass-through payments [will s]urely ... be paid by the state from accounts in the name of the state. Indeed, pass-through payments not made to the AFDC family are credited to the state's account .... To cloak such payments with immunity, however, ignores the fact that but for the illegal retention of the money by the state it would have been properly forwarded to the AFDC family as required [by law] .... The state may not violate the law by converting money which lawfully belonged to one of its citizens and then seek to insulate its actions under the immunity doctrine.

---

**6.** Plaintiffs also rely on section 1396b(u), in which Congress provides that FFP is available for "erroneous medical assistance expenditures." However, section 1396b(u) and the pursuant regulations address a kind of administrative cost that is materially different from the costs that would arise from a judgment in this action. Section 1396b(u)(1)(D)(i) defines " 'erroneous excess payments for medical assistance' [as] the total of—(I) payments under the State plan with respect to ineligible individuals and families, and (II) overpayments on behalf of eligible individuals and families by reason of error in determining the amount of expenditures for medical care required of

an individual or family as a condition of eligibility." 42 U.S.C.A. § 1396b(u)(1)(D)(i) (West 1992 & Supp.1999). In sum, section 1396b(u) makes FFP available in certain situations where the state has paid Medicaid benefits to someone who should not have received them or who should have received less than he or she did. *See also* 42 C.F.R. § 431.865(b) (1999) (containing definition of "erroneous payments"). Thus, the fact that FFP is available for the state's erroneous payments of Medicaid benefits does not support plaintiffs' position that FFP would be available for an award in this case.

*Beasley,* 671 F.Supp. at 921–22. The *Beasley* decision has found some support in subsequent district court cases. For example, in *Mosley v. Bowen,* 703 F.Supp. 1288, 1292–93 (S.D.Ohio 1989), *rev'd,* 920 F.2d 409 (6th Cir.1990), the court cited approvingly to *Beasley.*

However, the Sixth Circuit later reversed the district court's ruling in *Mosley* and thereby rejected *Beasley.* Furthermore, in *Kenyon v. Sullivan,* 761 F.Supp. 951, 957–58 (D.R.I.1991), the district court expressly rejected *Beasley* and instead endorsed the reasoning and outcome of *Bennett v. White.*

■ This court also relies on *Bennett v. White,* where the Third Circuit held that *"Edelman v. Jordan* ... prevents a federal court from requiring state officers to disgorge from the state treasury *even unlawfully converted property,* at least so long as the state pays for the disgorgement." 865 F.2d at 1408 (emphasis added); *see also Fernandez v. Chardon,* 681 F.2d 42, 59–60 (1st Cir.1982) (holding that back pay award against state was barred by Eleventh Amendment because state "cannot avoid using state funds to pay the award, and its budget will be affected").

*Bennett* and the cases that support it represent the more persuasive view. As such, the court finds that Eleventh Amendment immunity bars plaintiffs' claims in spite of the allegation that the state wrongfully converted plaintiffs' NAMIs.

### E. Implied Waiver of Eleventh Amendment Immunity

Plaintiffs also maintain that the Commissioner has impliedly waived his Eleventh Amendment immunity and submitted to this court's jurisdiction. *See* Item 120, p. 13.

1. *Commissioner's conduct and litigation strategy.*

As evidence of the Commissioner's waiver, plaintiffs first point to his extensive efforts to settle this lawsuit. To this effect, plaintiffs note that the Commissioner has made promises to the court and plaintiffs regarding a case management plan and the negotiation of refunds for plaintiffs. In addition, plaintiffs note that the Commissioner has already refunded client shares to at least forty-eight members of the plaintiff class. Plaintiffs conclude: "These representations and numerous others over the eight years this case has been in litigation must constitute a consent to jurisdiction, if such consent can ever be recognized." Item 120, p. 13.

The Commissioner denies that he has waived his Eleventh Amendment immunity. *See* Item 122, p. 5. The Commissioner argues that a state officer cannot waive Eleventh Amendment immunity unless such consent is unequivocally expressed. *See Close v. State of New York,* 125 F.3d 31, 39 (2d Cir.1997). The Commissioner states that plaintiffs have been on notice of his Eleventh Amendment defense from the outset. *See* Item 122, p. 6. Here, the Commissioner is referring to the first affirmative defense in his answer, where he alleged that this court lacked jurisdiction to grant the requested relief. *See* Item 14, ¶ 20. Furthermore, the Commissioner maintains that his attorneys' efforts to settle this lawsuit did not and do not constitute a waiver of the defense of Eleventh Amendment immunity.

■ In support of their position that the Commissioner's conduct constitutes a waiver of Eleventh Amendment immunity, plaintiffs rely on *Vargas v. Trainor,* 508 F.2d 485 (7th Cir.1974). In *Vargas,* the court found that the state waived its immunity because, in opposing the plaintiff's motion for an injunction pending appeal, the state argued: "If [plaintiff] is successful on the merits, [the state will pay her] any benefits wrongly withheld .... However, if an injunction pending appeal is granted and the trial court's decision [(which was favorable to the state)] is affirmed, the State will have no real way of recovering the monies paid out." 508 F.2d at 492. The court in *Vargas* found that the state waived its immunity when it

made representations regarding the state's willingness to comply with the ultimate outcome of the case. "A representation made in a judicial proceeding for the purpose of inducing the court to act or refrain from acting satisfies the requirements stated in *Edelman*. We therefore hold that defendant has deliberately waived the protection of the Eleventh Amendment." *Vargas*, 508 F.2d at 492. However, *Vargas* is not apt precedent. Here, the Commissioner has made no similar representations to this court in an effort to "induc[e] the court to act or refrain from acting."

Next, plaintiffs argue that the Commissioner has waived his Eleventh Amendment immunity because he has litigated this case for several years without ever raising the issue of the Eleventh Amendment. As evidence of this implied waiver of immunity, plaintiffs have cited a number of letters that the Commissioner's attorneys have written to plaintiffs' counsel and to the court regarding their willingness to settle this case. *See* Item 106, Exhs. G and I; Item 127, ¶¶ 4, 8, 10, and Exhs. A, B, and C. On this issue of implied waiver, however, the court relies on language from a recent Second Circuit opinion:

> At most, [*Patsy v. Board of Regents*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982),] raises the question of whether federal courts are required or merely authorized to consider *sua sponte* the Eleventh Amendment's applicability. *Indeed, the Patsy Court explicitly permitted the state to raise the defense on remand, even though the state had failed to raise the issue in the Supreme Court*. . . .
> However the Eleventh Amendment immunity may differ from other jurisdictional bars, *the law remains clear that it is jurisdictional enough that it need not be raised in the trial court.* Here, DOCS did raise the defense in the trial court, albeit in its motion for summary judgment rather than in its answer. To hold that that was "too late"—that that constituted a waiver—would run contrary to *Edelman* and *Ford Motor Co.*,

and *Patsy* does not hold to the contrary. . . .

DOCS did not waive its Eleventh Amendment immunity by failing to raise the defense until it moved for summary judgment, and we affirm the district court's decision to dismiss the state law claims against DOCS on Eleventh Amendment grounds.

*Richardson v. New York State Dep't of Corr.*, 180 F.3d 426, 449 (2d Cir.1999) (citations and quotation omitted) (emphasis added). In *Richardson*, the Second Circuit observed that the state may, for the first time, raise an Eleventh Amendment immunity defense after the case has been remanded by a higher court. Further, the court in *Richardson* held that the state did not wait too long to raise this defense when it did so for the first time in the context of a summary judgment motion. In light of *Richardson* and the foregoing discussion, the court holds that the Commissioner, by his conduct and litigation strategy, has not impliedly waived Eleventh Amendment immunity.

2. *Appearance by counsel.*

■ The court further holds that the Commissioner has not waived Eleventh Amendment immunity by appearing in this action through counsel. *See United States v. DCS Development Corp.*, 590 F.Supp. 1117, 1121–22 (W.D.N.Y.1984) ("[S]uch [immunity] cannot be waived by the appearance of New York's Attorney General in the case and can be raised any time, even upon appeal . . . .").

3. *Raising Eleventh Amendment in answer.*

■ Finally, the court rejects plaintiffs' argument that the Commissioner impliedly waived Eleventh Amendment immunity by failing to raise the defense in his answer. The Commissioner alleged in his amended answer, as an affirmative defense, that this court lacked requisite jurisdiction to grant the requested relief. *See* Item 14, ¶ 20. In any event, the Second Circuit has held

that the state is entitled to move for summary judgment on the basis of Eleventh Amendment immunity even if the state failed to raise that defense in its answer. *See Richardson,* 180 F.3d at 448–49.

### F. Segregated Accounts and Eleventh Amendment Immunity

Courts have held that Eleventh Amendment immunity does not protect the state from retroactive money awards where such an award would be paid from a segregated fund held by the state. *See Schiff v. Williams,* 519 F.2d 257, 262 n. 2 (5th Cir. 1975) (granting retroactive money award to editors of school newspaper from separate fund composed of student activity fees). Plaintiffs cite to *Fernandez v. Chardon,* 681 F.2d 42 (1st Cir.1982), for the proposition that there is no Eleventh Amendment immunity when "state funds are held in a separate account ... and an award limited to those funds will not affect the state's budgetary decisions ... [because] where the state will be unaffected by an award, its consent to suit and waiver of sovereign immunity seem unnecessary." *Id.* at 59.

■ The Commissioner bears the burden of establishing his entitlement to Eleventh Amendment immunity. *See ITSI T.V. Productions, Inc. v. Agricultural Ass'ns,* 3 F.3d 1289, 1291 (9th Cir.1993); *Christy v. Pennsylvania Turnpike Comm'n,* 54 F.3d 1140, 1144 (3d Cir.1995). In order to establish entitlement to Eleventh Amendment immunity, then, the Commissioner must show that the state's general fisc would be affected by an award in this case.

■ The court has carefully reviewed the record and finds no evidence regarding what actually happened to the NAMIs that were remitted to the state. Thus, the Commissioner has failed to establish Eleventh Amendment immunity because he has failed to establish that the state placed the remitted NAMIs into the state's general treasury, and has failed to show that an award in this case would necessarily come from the state fisc. Plaintiffs' claim

against the Commissioner in his official capacity may survive this motion for summary judgment to the extent that the remitted NAMIs were kept in segregated accounts, and to the extent that an award in this case would not be paid from the state's general treasury.

### II. Claims Against the Commissioner as an Individual

■ "The Eleventh Amendment bar, by definition, only applies to official capacity suits." *Yorktown Medical Laboratory, Inc. v. Perales,* 948 F.2d 84, 88 (2d Cir. 1991). Thus, the Commissioner will enjoy no Eleventh Amendment immunity with respect to plaintiffs' claims against him as an individual.

Section 1983 imposes liability on anyone who, under color of state law, deprives a person "of any rights, privileges, or immunities secured by the Constitution and laws ...." 42 U.S.C. § 1983 (1994). Thus, "[t]o state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988).

#### A. Federal Rights

Plaintiffs allege that the Commissioner violated their Constitutional rights to due process and equal protection by developing and implementing MOP II. *See* Item 1, ¶¶ 141–44, 148–51. The parties have not briefed these issues in their papers, and the court here does not conclusively decide whether the Commissioner violated plaintiffs' Constitutional rights. However, for the purposes of surviving the Commissioner's motion for summary judgment, the court recognizes that plaintiffs have adequately alleged a violation of their Constitutional right to due process.

■ The Fifth Amendment provides that the "[n]o person shall be ... deprived

of life, liberty, or property, without due process of law." U.S. Const. Amend. V. In this case, plaintiffs had a property interest in their NAMIs, which represented plaintiffs' monetary contribution to the cost of their care. Further, plaintiffs have alleged that the Commissioner, through MOP II, unlawfully authorized nursing homes to collect plaintiffs' NAMIs and that the Commissioner, in some instances, unlawfully collected those NAMIs from the nursing homes. *See infra,* Discussion, Part II C.

▮ In addition, plaintiffs have claimed that the Commissioner violated their federal statutory rights. However, "[i]n order to seek redress through § 1983 ..., a plaintiff must assert the violation of a federal *right,* not merely a violation of federal law." *Blessing v. Freestone,* 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997). Thus, if a defendant violated certain provisions of a federal statute, such as the Medicaid Act or the Medicare Act, there is no cause of action under section 1983 unless the plaintiff can establish, *inter alia,* that "Congress ... intended that the provision in question benefit the plaintiff." *Blessing,* 520 U.S. at 340, 117 S.Ct. 1353. Here, logic dictates that Congress intended the federal Medicaid and Medicare laws to protect plaintiffs who were, after all, beneficiaries of both Medicaid and Medicare. *See infra,* Discussion, Part II C 1. For the purposes of surviving summary judgment, the court finds that plaintiffs have adequately alleged violations of their federal rights—their Constitutional right to due process and their statutory rights under the federal Medicaid and Medicare laws.

### B. Personal Involvement

▮ With respect to plaintiffs' claims against the Commissioner as an individual, the parties have focused on whether the Commissioner was personally involved in any deprivation of federal rights. Indeed, for a state official to be held personally liable under section 1983, there must be evidence that the state official was "personally involved" in the deprivation. *See*

*Moffitt v. Town of Brookfield,* 950 F.2d 880, 886 (2d Cir.1991); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977).

The Second Circuit has held that "personal involvement" in a section 1983 violation may include: (1) a defendant who directly participated in the infraction; (2) a supervisory official who, after learning of the violation through a report or appeal, failed to remedy the wrong; (3) a supervisory official who created a policy or custom under which unconstitutional practices occurred or who allowed such a policy or custom to continue; or (4) a supervisory official who was grossly negligent in managing subordinates who caused the unlawful condition or event. *Moffitt,* 950 F.2d at 886.

In his amended answer, the Commissioner has admitted that: "MOP–II was developed by defendant Cesar Perales, ... as Commissioner of the New York State Department of Social Services ...." Item 1, ¶ 2 and Item 14, ¶ 5. Further, the Commissioner has admitted that: "MOP–II was implemented and administered by defendant Perales during the calendar year 1989." Item 1, ¶ 3 and Item 14, ¶ 1. In opposing and making motions for summary judgment, plaintiffs are entitled to rely on the admissions that the Commissioner has made in his judicial pleadings. *See* 11 *Moore's Federal Practice 3d,* § 56.14[2][d][iii], at 56–194 to 195.

On the other hand, the Commissioner has submitted a sworn affidavit, in which he states that prior to this litigation, he had neither personal involvement in nor knowledge of MOP II. *See* Item 113, ¶¶ 3–6. Specifically, the Commissioner now states that he:

> delegated primary responsibility for policy development to executive staff who served as deputy commissioners for the agency's many program and administrative areas. The Deputy Commissioner for Medical Assistance ... was empowered to develop and implement policies consistent with the DSS'[s] responsibilities as the single State Medicaid agency

.... The MOP II program was developed and implemented in accordance with this general principle of executive delegation and decision-making. *Id.* ¶ 5 (citation omitted). By his amended answer and affidavit, the Commissioner has offered differing views on his involvement in MOP II. As a practical matter, the court recognizes that the Commissioner based his affidavit on personal knowledge, while his involvement in drafting his amended answer may not have been as direct.

However, "[u]nder federal law, ... admissions in the pleadings are generally binding on the parties and the Court." *PPX Enterprises, Inc. v. Audiofidelity, Inc.*, 746 F.2d 120, 123 (2d Cir.1984). Thus, the court must conclusively accept as fact that the Commissioner "developed, implemented, and administered" MOP II, *see supra*, which plaintiffs allege was a policy under which the illegal practices occurred. *See Moffitt*, 950 F.2d at 886. Based on these admissions, the court concludes that the Commissioner was personally involved in creating and giving effect to MOP II. However, in the context of a motion for summary judgment, the court will not decide whether MOP II actually effected a violation of plaintiffs' federal rights.

### C. Qualified Immunity

In the alternative, the Commissioner argues that the doctrine of qualified immunity bars plaintiffs' claims against him as an individual. *See* Item 112, p. 4. Government officials enjoy qualified immunity when they perform discretionary functions that are within the scope of their employment. *See Shechter v. Comptroller of the City of New York*, 79 F.3d 265, 268 (2d Cir.1996). In this case, the court must assess whether the Commissioner's conduct violated " 'clearly established rights' of which a reasonable person would have known ...." *Soares v. Connecticut*, 8 F.3d 917, 920 (2d Cir.1993) (quoting *Finnegan v. Fountain*, 915 F.2d 817, 823 (2d Cir. 1990)). However, even if the court did find that the Commissioner's conduct vio-

lated such clearly established rights, the Commissioner could still argue that it was " 'objectively reasonable' [for him] to believe that [his] acts did not violate these clearly established rights." *Id.; see also Lennon v. Miller*, 66 F.3d 416, 423 (2d Cir.1995).

1. *Clearly established rights of which reasonable person would have known.*

The Supreme Court has held that a right is clearly established if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right .... [That is,] ... the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

In the present case, the court finds that in 1989, plaintiffs had "clearly established rights" under federal Medicaid and Medicare laws. As of 1989, federal Medicaid law prohibited the imposition of personal liability on a Medicaid recipient when a third-party source of payment, like Medicare, was available to pay for the care. *See* 42 U.S.C. § 1396a(a)(25)(C)(i) (1994); 42 C.F.R. § 447.20 (1999). Similarly, federal Medicare law at that time prohibited nursing homes from imposing charges on "any individual or any other person for items or services for which such individual is entitled to have payment made under this title." 42 U.S.C. § 1395cc(a)(1) (1994); *see also* 42 C.F.R. § 489.21 (1999). In light of these statutory provisions, the court concludes that plaintiffs had a statutory right not to be charged for the costs of nursing home services that were covered by their Medicare benefits.

Furthermore, the record could support the conclusion that Perales violated plaintiffs' statutory rights by developing and implementing MOP II. Again, MOP II was the state policy that authorized nursing homes to collect NAMIs from plaintiffs for services that were purportedly covered by their Medicare benefits. The court, how-

ever, refrains from deciding this issue here.

It must also be determined whether the Commissioner should reasonably have known of plaintiffs' aforementioned rights under the Medicaid and Medicare laws. In order for the Commissioner to be held personally liable, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034. Here, there is a strong argument that a reasonable commissioner of NYS DSS should have been aware of plaintiffs' rights under federal Medicare and Medicaid laws. *See Mahoney v. Hankin,* 844 F.2d 64, 68 (2d Cir.1988) (holding that applicable standard is that of reasonable official). However, the court declines to make such a finding at the summary judgment stage and leaves this issue to the finder of fact.

2. *Objectively reasonable belief that conduct did not violate plaintiffs' rights.*

■ Even if the Commissioner was or reasonably should have been aware of plaintiffs' rights, he may still establish his entitlement to qualified immunity if he can show that it was " 'objectively reasonable' [for him] to believe that [his] acts did not violate [plaintiffs'] clearly established rights." *Soares,* 8 F.3d at 920; *see also Harlow v. Fitzgerald,* 457 U.S. 800, 818–19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

On the issue of whether it was objectively reasonable for the Commissioner to believe that his conduct did not violate plaintiffs' rights, it is helpful to outline the relevant federal regulations. In addition to the rights that plaintiffs had under federal Medicaid and Medicare laws, *see supra,* as of 1989, federal regulations prohibited a state Medicaid agency from paying a claim when the state agency was aware that there was a third party that was liable for the claimed costs. "If the agency has established the probable existence of third party liability at the time the claim is filed, the agency must reject the claim and re-

turn it to the provider for a determination of the amount of liability." 42 C.F.R. § 433.139(b)(1) (1999). MOP II's pay and chase system did not comply with these federal regulations because the system allowed nursing homes to bill Medicare and Medicaid simultaneously and to keep the higher of the two payments. However, the federal regulations also allowed the state agency to request a waiver of these claims processing regulations "if [the state agency] determines that [a] requirement is not cost-effective." *Id.* § 433.139(e). NYS DSS recognized the conflict between MOP II and federal regulations and accordingly applied for a waiver of certain claims processing requirements found in section 433.139. *See* Item 113, ¶ 11.

Thus, the Commissioner insists that MOP II was developed and implemented in good-faith reliance on the belief that the Health Care Finance Administration ("HCFA") would ultimately grant NYS DSS its requested waiver. *See id.* However, the HCFA denied the state's application in May of 1989. *See* Item 113, Exh. G. After NYS DSS received the denial, the Commissioner claims that NYS DSS immediately abandoned MOP II. *See* Item 113, Exh. H; and Item 114, Exh. A, ¶ 17.

In light of this factual background, the Commissioner argues that his conduct was "objectively reasonable." That is, the Commissioner argues that MOP II was allowed to continue because he reasonably believed that the HCFA would approve the state's application for a waiver. Here, too, the court will not determine whether, as a matter of law, it was "objectively reasonable" for the Commissioner to believe that his conduct did not violate plaintiffs' federal rights. As previously indicated, the court will leave such a question for the finder of fact.

### CONCLUSION

For the reasons stated herein, the court denies plaintiffs' motion for summary judgment (Item 105) in its entirety. With respect to the official-capacity action, the

court grants in part and denies in part the Commissioner's motion for summary judgment (Item 125), with leave to renew on the issue of segregated accounts. Finally, the court denies the Commissioner's summary judgment motion (Item 125) with respect to the individual-capacity action.

So ordered.